FILED by _PG_ D.C.

MAR 31 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**Case No. _____-CV-_____**

CEVIN D. KEHM,                          )
        Plaintiff,                      )
vs.                                     )
                          )
AIR LINE PILOTS ASSOCIATION, )
INTERNATIONAL,                          )
        Defendant                       )          **DEMAND FOR JURY TRIAL**

## PLAINTIFF'S ORIGINAL COMPLAINT

I, CEVIN D. KEHM, Plaintiff pro se in the above styled cause, hereby file my Complaint – and make these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery - against Defendant, AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter "ALPA" or "Defendant"), and allege as follows:

## INTRODUCTION

1.    In 1997, the pilots of American Eagle Airlines bargained for and ratified the right to "flow-through" from American Eagle Airlines to careers at American Airlines with much higher net pay and benefits in exchange for a contract of

sixteen (16) years duration with yearly pay adjustments to be determined by the average raises of other, similar carriers each year and a "no strike" clause for the sixteen (16) year duration of the agreement.

2.   As part of its roadshows advocating for the new contract, ALPA advised American Eagle pilots that every American Eagle pilot employed on or before 1997 would transfer to American Airlines under the "flow-through" provision of the new contract within five (5) years, unless those pilots chose to stay at American Eagle Airlines as "Eagle Rights" pilots.

3.   From the outset, the flow-through agreement did not provide the benefits it was purported to have by ALPA. Numerous disputes arose and many arbitrations occurred, attempting to interpret, re-interpret and capture what the flow-through agreement was supposed to provide: fifty (50) percent of all American Airlines new hire pilots were to come from the ranks of American Eagle flow-through pilots.

4.   Beginning in 2001, a set of arbitrations took place on the American Eagle Airlines property. These arbitrations were uniformly decided in favor of the American Eagle flow-through pilots and against management – and crucially, against the Allied Pilots Association's (hereinafter "APA") - interpretations and desires. The APA represented the American Airlines pilots.

5.   In 2002, a newly elected group of ALPA pilot representatives took office on the American Eagle property. These representatives had no flow-through rights and proved hostile to the existing and arbitraly upheld rights of flow-through pilots and breached ALPA's duty of fair representation to the Plaintiff by exchanging arbitral rulings in favor of the Plaintiff transferring to American Airlines for new American Airlines employment rights for themselves and their core group of political supporters.

6.  By manipulating the dispute resolution process in a manner that was arbitrary and in bad faith and by engaging management in negotiations that were kept secret from the American Eagle flow-through pilots, ALPA breached its duty of fair representation to the Plaintiff and ultimately secured the new employment rights at American Airlines it sought, at the expense of the rights of the Plaintiff.

7.  At all relevant times during the events described herein, and specifically after October 2000, ALPA had a conflict of interest in representing the American Eagle pilots; ALPA's overriding goal was to organize the pilots of American Airlines, who were – and currently are – represented by the APA. Although a signatory to Letter 3, the APA never embraced the American Eagle pilots' rights under Letter 3 and often took positions in disputes and arbitrations that were contrary to the best interests of those American Eagle pilots, even though those American Eagle pilots possessed American Airlines seniority numbers. It was no secret on the American Eagle property that many American Airlines pilots – and APA representatives – held American Eagle pilots in generally low regard. ALPA did not want to be viewed by the APA, whose members – and more importantly, dues money – they so coveted, as being staunch defenders of American Eagle pilots' rights in what the APA viewed as a zero-sum game relationship: any gains made by American Eagle pilots can only come at the expense of the American Airlines pilot.

8.  Finally, ALPA breached its duty of fair representation to the Plaintiff when it arbitrarily, discriminatorily and in bad faith caused and/or allowed him to be stripped of his American Airlines seniority number based on his duress resignation from American Eagle Airlines, a resignation that would have never occurred had the Plaintiff transferred to American Airlines under the provisions of, and in compliance with Letter 3 of the American Eagle pilot contract and previous arbitration rulings dating back as far as May, 2007.

## JURISDICTION AND VENUE

9.  This Court has proper jurisdiction to entertain the claims set forth herein by virtue of 28 U.S.C. sec. 1331 (federal question jurisdiction); and by virtue of section 301 (b) of the Labor Management Relations Act (29 U.S.C. sec. 141 et seq.); the Labor Management Reporting Disclosure Act ["LMRDA"] (29 U.S.C. sec. 401 et seq.); 28 U.S.C. sec. 1337 (a); the Railway Labor Act ["RLA"]  (45 U.S.C. sec. 151 et seq.); and by virtue of the Court's equitable, pendant and supplemental jurisdiction (28 U.S.C. sec. 1367).

10. This Court is a proper venue for the claims set fourth herein pursuant to 28 U.S.C. sec. 1391, by virtue of the fact that Defendant does business within this district, in that:

    i.   ALPA represents hundreds of American Eagle Airlines pilots who are based at Miami International Airport, which is located within this district.

    ii.  But for ALPA's actions harming Plaintiff, the Plaintiff would be currently employed and based within this district.

    iii. Plaintiff resides in this district.

## THE PARTIES

11. Plaintiff Cevin D. Kehm was an American Eagle Airlines pilot from January 31, 1991 until March 18, 2013, when Plaintiff resigned under duress.

12. Plaintiff was a "flow-through" pilot at all pertinent times referred herein and remains so today.

13. At all pertinent times referred to herein, defendant ALPA was and is an unincorporated association acting as a labor union.

14. ALPA is the largest airline pilot union in the world and represents some 53,000 pilots at dozens of airlines in the United States and Canada. It is chartered by the AFL-CIO and the Canadian Labour Congress, and is a member of the International Federation of Air Line Pilot Associations.

15. ALPA is a labor organization and is the certified representative of employees under the provisions of the Railway Labor Act.

16. ALPA's principle place of business is Herndon, Virginia.

17. ALPA maintains offices in other locations, including Washington, D.C.

18. ALPA conducts business nationwide, including in this district. ALPA may be served with summons through its registered agent for service or process or through its officers, wherever they may be found.

## BACKGROUND

19. In the Fall of 1997, the pilots of American Eagle Airlines, as represented by ALPA, ratified a sixteen (16) year duration Collective Bargaining Agreement (hereinafter "CBA") that contained a provision that moved certain American Eagle pilots to American Airlines under a defined protocol.

20. This protocol is known as "Letter 3 Supplemental Agreement" (hereinafter "Letter 3") to the CBA, and provided that, after a defined "training freeze" or "lock-in" period, certain qualifying pilots would be moved to employment at American Airlines in a ratio of one (1) qualifying American Eagle pilot for every one (1) non-American Eagle new-hire pilot that American Airlines hired (hereinafter "one out of two" or "1:2").

21. In October 2000, the Executive Board of ALPA resolved to organize all pilots not then represented by ALPA. This included the pilots of American Airlines.

22. The APA also held an executive board meeting on or about October of 2000. APA resolved at this meeting to explore a merger with ALPA. To this end, it created an "ALPA Exploratory Committee." This committee was charged with preparing a report on ALPA and the ramifications of a merger. At all relevant times, the APA resolution and ALPA's resolve to obtain the representation rights for American Airlines pilots was unknown to the American Eagle pilots and concealed from the American Eagle pilots by ALPA.

23. In the last quarter of 2000, ALPA spent over $54,000 in expenses relating to its efforts to organize the American Airlines pilots. This was not disclosed to and was concealed from the American Eagle pilots. Upon information and belief, ALPA spent considerable sums in 2001 and 2002 to organize the APA members.

24. As a result of the events of September 11, 2001, American Airlines furloughed thousands of former TWA and current American Airlines pilots. American Airlines had acquired TWA in January of 2001 and was in the process of integrating the airline and its pilots into American Airlines.

25. During and subsequent to this period, TWA, LLC pilots were offered captain positions at American Eagle Airlines, consistent with what the APA, the union representing the American Airlines pilots, believed was the intent of Letter 3.

26. TWA, LLC pilots who were fired or who resigned from American Eagle Airlines at all times retained their American Airlines seniority number and were ultimately offered employment at AA, regardless of whether or not they still worked at American Eagle Airlines.

27.  In 2001, as a consequence of this massive furlough, ALPA attempted – via the dispute resolution process and ultimately arbitration – to change the flow-through protocol from "one out of two" to a transfer mechanism based solely on the seniority number of the flow-through pilot. If – for example – a flow-through pilot were more senior on the American Airlines seniority list than a furloughed TWA or American Airlines pilot, such flow-through pilot would be "recalled" to American Airlines ahead of any more junior furloughed American Airlines or TWA pilot.

28.  The arbitrator in the above dispute ruled against ALPA and stated that American Eagle pilots were not considered "furloughed" American Airlines pilots and that Letter 3 provided no transfer mechanism other than one flow-through pilot per one American Airlines non-flow through new hire pilot ("one-out-of-two").

29.  ALPA next filed a grievance contending that TWA pilots were in fact new hire pilots and that as such, they should trigger Letter 3 flow-through provisions for American Eagle pilots.

30.  On May 11, 2007, Arbitrator LaRocco ruled that former TWA pilots who did not commence active employment at American Airlines in conjunction with the merger (who in fact were furloughed by American Airlines directly from TWA, LLC, and who had never commenced new-hire training at American Airlines) were equivalent to new hires within the meaning of Letter 3, and that the presence of former TWA pilots on the American Airlines seniority list cannot interfere with the rational operation of Letter 3.

31.  After Arbitrator LaRocco's ruling clearly in favor of American Eagle pilots governed by Letter 3, MEC Officers and the MEC Negotiating Committee realized that they had leverage to create new rights to move themselves to American Airlines, as American Airlines management and the APA were opposed to American Eagle pilots flowing-through to American Airlines. Given their

politically powerful positions running ALPA on the American Eagle property and their desire to create new employment rights at American Airlines for themselves and the group of pilots supporting them in power, ALPA began manipulating the dispute resolution process, including arbitrations, in order to insure their preferred arbitrary, discriminatory and bad faith-based outcome. Once this decision was taken, ALPA began a long period of non-communication and misleading communication with the membership about what was occurring to enforce Letter 3 rulings in favor of flow-through pilots. The result was to tilt the playing field in favor of the union officers and committee members involved in crafting new employment rights at American Airlines by misleading the membership – and especially the Letter 3 pilots – into thinking that their rights were being enforced and not attenuated and changed, as ALPA was actually pursuing.

32.  Subsequent to Arbitrator LaRocco's ruling (described above), American Eagle management filed a grievance over the question of what effect the expiration of Letter 3 (on May 1, 2008) would have on American Eagle pilots' employment opportunities at American Airlines under that agreement (Letter 3).

33.  On June 30, 2008, Arbitrator Bloch ruled that the right to flow-through to American Airlines is to be retained by American Eagle pilots governed by Letter 3 who, prior to May 1, 2008 received American Airlines seniority numbers.

34.  On October 20, 2008, Arbitrator LaRocco awarded American Airlines seniority numbers to a group of American Eagle pilots that included the Plaintiff.

35.  Subsequent to Arbitrator LaRocco's ruling and award, and subsequent to Arbitrator Bloch's determination, each in favor of and supporting the contractual rights of Letter 3 pilots and the Plaintiff, ALPA never moved to enforce such rights and never demanded that management begin immediately complying with the arbitration awards described above. Had ALPA done so, the Plaintiff would have commenced employment at American Airlines during 2010.

36.  The CBA states that the System Board of Adjustment's decisions will be "final and binding and conclusive" on the Company and the Association.

37.  Under the CBA generally, and Letter 3 specifically, ALPA has the right to enforce arbitration decisions in federal court against any and all parties pursuant to the Railway Labor Act, as amended.

38.  ALPA declined to enforce these decisions in, or out of, federal court and instead allowed American Airlines and American Eagle Airlines managements to continue violating Letter 3, while it (ALPA) embarked on a period of publically stated uncertainty over how to proceed. While American Eagle Letter 3 pilots were being harmed by non-compliance with Arbitrators LaRocco and Bloch's rulings and awards, ALPA advised the pilots it represented on the American Eagle property that it would not be rushed into any decision on a course of action.

39.  ALPA elected officials referred to American Eagle Letter 3 pilots as members of a "subgroup", and repeatedly stated that American Eagle pilots "would not pay twice" for Letter 3 pilots to be able to exercise their rights under Letter 3 and pursuant to arbitral opinions. How or why American Eagle pilots would "pay twice" was never disclosed by ALPA.

40.  On June 1, 2009, almost seven (7) months after the last arbitral award (LaRocco's award of American Airlines seniority numbers to American Eagle pilots, including the Plaintiff), ALPA placed a grievance before Arbitrator Nicolau who stated that the parties had now agreed to the "narrow question": "Were American Eagle pilots who hold American Airlines seniority numbers entitled to attend American Airlines training classes beginning in June, 2007?" June 2007 was two (2) full years prior to the date this question was asked of Arbitrator Nicolau.

41.  Even though all parties agreed that the question was "narrow," ALPA officers and grievance personnel introduced the idea of "downstream damages" into the "narrow question." ALPA acknowledged that pilots prevented from

flowing through to American Airlines were harmed, but ALPA also maintained that pilots denied promotions within American Eagle Airlines, and who were not flow through pilots, and thus had no rights under Letter 3, were also harmed by the non-movement of American Eagle pilots to American Airlines. Upon information and belief, ALPA, from this point forward, operated only on obtaining "downstream damages" for the non-Letter 3 pilots. As the final resolution of this matter clearly – and unequivocally – indicates, the pilots with rights under Letter 3 were penalized so as to "purchase" new rights to employment at American Airlines for pilots who previously had no tights to such jobs, and for whom the Letter 3 disputes did not apply.

42. These new rights to employment at American Airlines were delineated in what is known as the "824 Agreement," (and its progeny) and resulted from clandestine and secret negotiations between MEC officers and committeemen and American Eagle Airlines management.

43. On October 18, 2009, Arbitrator Nicolau ruled that American Eagle pilots who held American Airlines seniority numbers were, in fact, entitled to attend American Airlines training classes beginning in June 2007.

44. Again, rather than enforce an arbitral ruling in favor of the flow-through pilots by demanding immediate compliance by management with Arbitrator Nicolau's ruling, or enforcing his ruling and the previous supporting rulings by Arbitrators LaRocco and Bloch in federal court, ALPA continued a lengthy and clandestine negotiation with management that centered on creating new employment rights at American Airlines for non-Letter 3 pilots, using the arbitration rulings as leverage. These negotiations were driven by a group of pilots who were elected to the highest positions within the governing body of ALPA on the American Eagle Airlines property, known as the Master Executive Council

(hereinafter "MEC"), and who had no rights to employment at American Airlines under the now-expired Letter 3 of the CBA.

45.   ALPA elected pilot representatives were advised by MEC elected officers that issues surrounding Letter 3 were "political" and could not be discussed with ALPA lawyers. Two (2) such ALPA representatives advised the Plaintiff that, on matters pertaining to Letter 3, and specifically during a discussion about Letter 3 arbitrations, "we were told by the leadership that we must keep the legal and political separate." When the Plaintiff advised these two representatives to speak with ALPA lawyer Wayne Klocke, who holds the title of Senior Labor Relations Counsel, and is attached to the ALPA/American Eagle MEC office in Euless, Texas, about the specifics relating to an arbitration decision, the Plaintiff was told, "we are not allowed to." When the Plaintiff inquired as to what could possibly be political about a Letter 3 arbitration and ruling, he was given no answer.

46.   Upon information and belief, such a directive preventing elected representatives from discussing Letter 3 matters with ALPA counsel was issued, directly or indirectly, by ALPA lawyers to preclude ALPA lawyers from becoming involved in, or having knowledge of, the MEC officers' improper attempts to negotiate new employment rights at American Airlines at the expense of the Letter 3 pilots with pre-existing rights, thus preserving their future ability to deny any knowledge of negotiations trading rights of one group of pilots for new rights for another group.

47.   Rather than accepting and complying with Arbitrator Nicolau's ruling, and per agreement between the four (4) parties to Letter 3 (ALPA, American Eagle Airlines, Inc., the APA and American Airlines, Inc.), the question of remedy in the Nicolau ruling was to be returned to the parties for determination, with Arbitrator Nicolau maintaining jurisdiction.

48. The parties could not agree on a remedy and the question was returned to Arbitrator Nicolau, who scheduled hearings to be held on February 25 and 26 and March 30, 2010.

49. By this time, the question before Arbitrator Nicolau transformed itself from a "narrow question" into a question that was "complex and the answer difficult", according to Arbitrator Nicolau in his Opinion and Award.

50. In preparations for the Nicolau remedy hearing, John J. Gallagher, attorney for American Eagle Airlines wrote arbitrator Nicolau a lengthy and very detailed letter advising the arbitrator of his client's position on the numerous issues surrounding what he had previously agreed was a "narrow question." In his letter, Mr. Gallagher states that the position of American Eagle Airlines was that American Eagle Letter 3 flow-through pilots were entitled to attend training classes at American Airlines beginning in June 2007, consistent with the LaRocco Opinion of May 11, 2007, but that the APA and American Airlines "opposed the flow-up of eagle pilots..."

51. At the opening of Nicolau's "Remedy Phase" hearing on February 25, 2010, ALPA lawyer Wayne Klocke, speaking about American Eagle pilots governed by Letter 3, stated: "the longer that we delay their transfer, the greater their damages by not being at American..." He also stated that Letter 3 of the CBA mandates the "one-out-of-every-two new hires" requirement.

52. Upon information and belief, ALPA MEC officers and committeemen on the American Eagle property were privately and clandestinely offering American Eagle Airlines management wavier of those provisions applicable to Letter 3 pilots that were unfavorable to American Eagle management and the APA in exchange for new rights for another group of American Eagle pilots, including those union officials, and ALPA lawyer Klocke was aware of such activity.

53.  During the course of the Remedy Phase hearings, ALPA was made aware of negative consequences that would accrue to American Eagle Airlines and its pilots should Arbitrator Nicolau's remedy be crafted according to the tenants of his ruling on the "narrow question." The lawyer for American Eagle Airlines used the phrase "severe operational consequences" and American Eagle's Vice President of People stated that the company would need to ground a minimum of 50 aircraft and pull down a significant amount of the American Eagle schedule. At no time during the remedy phase, or the mediated secret negotiations that followed, did ALPA ever advise the American Eagle pilots that enforcement of the arbitrator's award could – or would – have negative and severe consequences to American Eagle Airlines or its pilots, who were (and are) represented by ALPA. In fact, at no time has ALPA ever made such a representation to the American Eagle pilots as a basis for negotiating away the contractual rights (upheld by three (3) arbitrators) of Letter 3 pilots.

54.  During the second day of hearings in the Nicolau Remedy Phase on February 26, 2010, Captain Ralph Hunter, a member of the 1991 APA Negotiating Committee, who negotiated Letter 3 on behalf of the American Airlines pilots, stated that the only way for a flow-through pilot to be removed from the American Airlines seniority list was via a demonstrated hardship and that the American Eagle pilot who accepted flow-through – as did the Plaintiff – incurred a "liability" to flow up to American Airlines and even if such a pilot elected to not flow up – which the Plaintiff did not – the pilot would not be released from his obligation to flow-through absent a demonstrated hardship.

55.  At this same hearing, Kenneth Cooper, ALPA retired Assistant Director of Representation and an ALPA negotiator who negotiated Letter 3 of the CBA stated that "…you were going to AA unless you did one of two things: Elected 'Eagle Rights' or could demonstrate a hardship". The Plaintiff in this matter did neither.

56.  Additionally, at this hearing Kenneth Cooper stated that an American Eagle pilot who elected "Eagle Rights" was not eligible for future new hire positions at American Airlines which otherwise might become available and that by electing "Eagle Rights", an American Eagle pilot foreclosed himself from going to AA.

57.  ALPA attempted to disguise the changes of this provision, crucial to MEC Negotiating Chairman and then MEC Chairman Tony Gutierrez, who was an "Eagle Rights" pilots who would be barred from future new hire positions at American Airlines, by fraudulently misrepresenting the change to Letter 3 as the result of Arbitrator Nicolau's own independent determination and not as it was: the product of negotiations between ALPA and management.

58.  Mr. Cooper also stated that, referring to a flow-through American Eagle pilot transferring to American Airlines: "I mean, it was a question of, when his number came up, the opportunity came up, we expected he was going".

59.  On Monday, March 29, 2010, a dinner meeting took place in Washington, D.C. at which the principles (four people, one from each party to Letter 3), attended.

60.  The next morning, Tuesday, March 30, 2010 at 10:10 AM, the third and final hearing in the Nicolau Remedy Phase took place in Washington, D.C. This meeting was remarkable in several respects. It began with ALPA lawyer Wayne Klocke handing a stipulation to Arbitrator Nicolau, followed by Mr. Klocke stating that he was willing to make certain arguments now "off the record", but was willing to address them later when it came time for post-hearing briefs. Arbitrator Nicolau agreed that the matter referenced by Klocke would be allowed to be addressed in the post-hearing briefs. Next, American Airlines attorney Harry A. Rissetto told Arbitrator Nicolau about the principles' dinner the night before and that ideas came from that dinner that may be relevant to the current hearing. At this

point, ALPA lawyer Klocke stated: "I'd suggest that be off the record". All parties present agreed to go off record.

61.  Prior to going off record, Arbitrator Nicolau asked if the off-the-record testimony could be "taken down confidentially, I mean not be a part of the public record".

62.  All parties agreed to this confidential transcription, and ALPA attorney Klocke added: "I made the comment because I have the understanding that some of the people may have been speaking in a mediation like tone or setting, that they may have anticipated that their conversations were in the nature of potential settlement".

63.  The settlement referred to by Klocke was the product of ALPA willingly trading away the rights of the Plaintiff for new rights; rights that amounted to a windfall for pilots who had no rights under Letter 3 of the CBA, and certainly had no rights to jobs at American Airlines.

64.  American Eagle Airlines attorney Jack Gallagher then suggested that the parties stipulate that "at the arbitrator's request the reporter will remain to take notes for the arbitrator as the arbitrator's notetaker and even have her break the transcript and have that part of her services billed with the arbitrator's services. It may not be necessary to go that far, but basically whatever notes she takes from that point forward are the arbitrator's notes and not any record of the four parties."

65.  The record was then closed and reopened so that Arbitrator Nicolau could make a determination that the post-hearing briefs he allowed earlier in the hearing were no longer needed, "particularly since it is in the interest of everyone that my award be issued sooner rather than later.

66.  Apparently, all the issues that needed to be argued in post-hearing briefs and all the differences between the parties had suddenly resolved themselves in the

span of less than one (1) hour and subsequent to the decisions taken and agreements reached at the principles' dinner the night prior to the hearing.

67. The reporter indicates that the arbitration concluded at 10:42AM, some thirty-two (32) minutes after it began.

68. At no time during the course of the three (3) days of Remedy hearings, did any party ever challenge Arbitrator Nicolau on jurisdiction and there is no basis to assume he was not willingly granted such wide jurisdictional latitude as the parties needed to accomplish their aims. Additionally, at no time was Arbitrator Nicolau ever advised that a prior ruling by another arbitrator upheld the "one-out-of-two" transfer mechanism and disallowed the seniority-based "recall" scheme that ALPA negotiated with the parties at this mediated negotiation session.

69. The only representative of the American Eagle pilots present at this last and crucial Remedy Hearing was Brian Sweep, the Chairman of the ALPA Contract Compliance Committee, and who, upon information and belief, was paid by American Eagle management and worked full time for ALPA from his home in Maine.

70. The mediated negotiation that was masqueraded by ALPA as a Remedy Hearing, described in paragraphs 48-69, traded existing rights of flow-through pilots – rights that had been affirmed by at least 3 separate arbitrations - for entirely new rights for pilots like Brian Sweep, who held a high union office and participated in the events of March 29 and 30, 2010.

71. The product of this negotiation was never presented to the governing body of ALPA on the American Eagle property (the MEC) for their vote to approve or reject, as is required of negotiated agreements.

72. Upon information and belief, only 4 high ALPA elected officials directed and conducted this negotiation and signed off on the final product: The MEC Chairman, the MEC Vice-Chairman, the MEC Negotiating Committee Chairman

and the MEC Contract Compliance Chairman, all of whom had a personal interest in the outcome and who each benefitted from the outcome.

73. As a result of this mediated negotiation, the Plaintiff not only lost the ability to transfer to American Airlines upheld by Arbitrators LaRocco, Bloch and Nicolau, but had his transfer mechanism detrimentally – and fatally – changed from that mandated by Letter 3 (i.e. one-out-of-every-two new hires) to a seniority-based system rejected by a previous arbitration and which guaranteed that the Plaintiff would only be allowed to transfer to American Airlines after every other furloughed pilot on the American Airlines seniority list was offered recall, and only if, after that point, American Airlines wished to bring on any additional pilots.

74. At all times since the Nicolau Remedy was published, ALPA has misrepresented to the American Eagle pilots that the ruling was the arbitrator's and his alone, and that ALPA had no role in the harm that accrued to flow-through pilots as a result of the crafting of new employment opportunities at American Airlines that were championed, designed and pursued by a select group of union officers and committeemen for personal benefit.

75. Nicolau's Remedy Award was dated April 9, 2010.

76. From June 2007 until April 2010, no American Eagle Letter 3 pilots transferred to American Airlines.

77. At all times subsequent to Arbitrator Nicolau's ruling, the Plaintiff was denied each and every request for documents, briefs and transcripts of both the LaRocco and Nicolau arbitrations, even though the Plaintiff had an interest in those matters and was a member in good standing of ALPA. No reason was ever supplied to the Plaintiff as to why his requests for material produced by, and relevant to, the above-described arbitrations were denied.

78. Upon information and belief, another interested Letter 3 pilot made arrangements with ALPA to come to the ALPA offices in Euless, Texas to view

the transcripts and briefs related to the LaRocco and Nicolau arbitrations, but when he arrived, he was advised by ALPA that the subject documents were no longer present at the offices, which were the principle and only offices of the American Eagle Airlines division of ALPA.

79. On March 18, 2013, the Plaintiff resigned under duress from American Eagle Airlines in order to access 401(k) savings that were needed while recovering from an illness. At no time did the Plaintiff ever resign his American Airlines seniority number and at no time did ALPA or American Eagle Airlines ever advise the Plaintiff that his resignation would – in their estimation – cause the Plaintiff to lose his American Airlines seniority number.

80. Upon information and belief, it was ALPA who demanded that Plaintiff be removed from the American Airlines seniority list in retaliation for Plaintiff's lack of support and criticism of the then current ALPA administration on the American Eagle property.

81. The Plaintiff has expressed criticism of ALPA, and did so based on his many years of union service, which culminated with his election as MEC Chairman in 2000, the highest elected position on any ALPA property.

82. Throughout the arbitration processes, beginning prior to the LaRocco arbitration in 2008, and concluding only months ago in 2014, the Plaintiff was in constant written and telephonic communication with ALPA lawyers in Texas and Washington, D.C., warning about the harm accruing by ALPA's local actions in the matter of Letter 3, including non-enforcement and dispute resolution manipulation, and apprising ALPA lawyers that these actions by the elected officers and others constitute breaches of ALPA's duty of fair representation to the Plaintiff.

83. On or about May 2013, the Plaintiff's Letter 3 peers began receiving notification from American Airlines that they were finally being summoned to class at American Airlines.

84. The Plaintiff, having received no notification of class at American Airlines, advised ALPA lawyer Wayne Klocke on May 21, 2013 that he had received no notice from American Airlines and reiterated Plaintiff's claim that he had not relinquished his American Airlines seniority number.

85. Klocke responded to Plaintiff on May 24, 2013, not with an offer of help but with questions about Plaintiff's resignation.

86. Plaintiff responded to Klocke on May 24, 2013 and advised Klocke that he (Plaintiff) currently met all requirements for transfer to American Airlines and requested that ALPA file a grievance on behalf of the Plaintiff regarding his exclusion from American Airlines new hire class.

87. ALPA lawyer Klocke responded on July 10, 2010 that "in no prior instance has a pilot who has received an AA seniority number under Letter 3 been offered a flow through position in an AA new hire class at a time when that pilot was no longer employed with American Eagle". Klocke was certainly aware at the time he made such statement that the present claim by the Plaintiff was never before raised, encountered or challenged on the American Eagle property.

88. ALPA agreed to process Plaintiff's grievance but concluded sight unseen that it would not support Plaintiff's position in the grievance. Upon information and belief, paragraph 81 describes why ALPA opposed the Plaintiff's grievance.

89. Then Klocke, apparently changing his mind due to direction from ALPA lawyers in Washington, D.C., advised the Plaintiff that ALPA might support his grievance if he provides "substantial evidence" that Plaintiff was forced to resign. Klocke was advised that he was already aware of the entire and complete circumstances surrounding the Plaintiff's resignation because the Plaintiff had

discussed these issues openly and forthrightly with Klocke, in his capacity as counsel to ALPA members in good standing (as was the Plaintiff), over several telephone calls.

90. This is evidenced by the fact that Klocke worked on a 401(k) access problem on behalf of the Plaintiff, and at the Plaintiff's request, during this period.

91. Klocke reiterated ALPA's willingness to file and process Plaintiff's grievance and even advised that it would be to the Plaintiff's benefit to file his grievance sooner rather than later.

92. On October 2, 2013, the Plaintiff supplied ALPA with the text of his grievance.

93. Beginning on October 2, 2013 through November 12, 2013 ALPA lawyer Klocke, under guidance from ALPA lawyer Jim Lobsenz, who is based at ALPA headquarters in Washington, D.C., attempted to coerce the Plaintiff into crafting a grievance that was acceptable to ALPA, and not responsive to the violations alleged by the Plaintiff.

94. Plaintiff refused to remove from his grievance the issues that constitute the majority of this resulting complaint.

95. ALPA did not comply with the dispute resolution process timelines contained in Letter 3 and did not conduct a meeting of the signatories to Letter 3, as is required and described by Letter 3 and as has been the past practice. Instead, the only meeting that took place was a meeting of lawyers representing the Letter 3 signatories who, by ALPA's own admission, were not empowered to make any decisions about resolving the subject dispute on behalf of their respective clients, which is the express purpose of the Letter 3-mandated meeting. Finally, after dragging out the grievance process for almost three and a half (3.5) months, ALPA reneged on its commitment to process the grievance on behalf of the Plaintiff,

using the excuse that the other parties would not agree to participate in a mandatory dispute resolution process.

96.  Throughout his years of union service, the Plaintiff has never heard of permission needing to be required from management or other obligated party prior to being able to access the mandatory and contractually agreed-upon dispute resolution process. If such were the case, management would never agree to arbitrate and no dispute would ever be resolved.

97.  On January 9, 2014, ALPA advised the Plaintiff that it would take no further action in the matter of the Plaintiff's grievance.

## Count 1:
## Breach of the Duty of Fair Representation
## Damages Sought: Lost Career Earnings of $ 3,000,000.00

98.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "97" hereof, with like force and effect as though set forth at length herein.

99.  ALPA, representing the pilots of American Eagle Airlines owes a duty to fairly represent the Plaintiff even if doing so is at odds with the goals and agenda of ALPA MEC officials and certain committee members and chairmen.

100.      The ruling and supplemental award by Arbitrator LaRocco on May 11, 2007, in favor of the Plaintiff, was never enforced by ALPA, nor did ALPA demand compliance with the ruling by American Eagle and American Airlines management.

101.     ALPA has the contractual right to enforce arbitration decisions in federal court and arbitrations are "final, biding and conclusive" on the company and ALPA.

102.     ALPA engaged in improper activities to delay and avoid enforcement of Arbitrator LaRocco's ruling and award and engaged in discussions with American Eagle management about new rights for union official and their supporters.

103.     ALPA thus denied the Plaintiff the right to flow through to American Airlines consistent with his rights, as affirmed by Arbitrator LaRocco.

104.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by bad faith.

105.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by arbitrariness.

106.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by discrimination.

## Count II:

### Breach of the Duty of Fair Representation
### Damages Sought: Lost Career Earnings of $ 3,000,000.00

107.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "97" hereof, with like force and effect as though set forth at length herein.

108.     ALPA arbitrated the LaRocco ruling before Arbitrator Nicolau in an attempt to delay enforcement of Arbitrator LaRocco's award and allow for more time to negotiate new rights to jobs at American Airlines for pilots who had no stake or benefit in Letter 3.

109.    Arbitrator Nicolau declined to undo Arbitrator LaRocco's ruling and, in fact, strengthened LaRocco's award.

110.    ALPA's silence about non-enforcement of LaRocco and the practical effect of Nicolau's initial ruling deprived American Eagle pilots, including the Plaintiff, with information necessary to challenge ALPA's activities in Letter 3 matters.

111.    When the four (4) parties to Letter 3 could not reach agreement on the remedy resulting from Arbitrator Nicolau's award, and the matter was returned to Arbitrator Nicolau for imposition of remedy, the parties intensified their negotiations, culminating with a March 30, 2010 Remedy Phase hearing in Washington, D.C. that began with unresolved issues of importance and the need for post-hearing briefs to a completely resolved matter with no post-hearing briefs being required by the arbitrator, all in a time span of thirty-two (32) minutes.

112.    At all times during and since the "Nicolau Award", ALPA has misrepresented the mediated negotiations as an arbitration, and blamed any and all harm that befell Letter 3 pilots, as well as the newly acquired rights to employment at American Airlines as the result of the arbitrator's independent ruling and his unilateral "award", and at no time did the MEC officers have the governing body of the American Eagle pilots (the MEC) vote on these results of negotiations with management, as is required when creating new contractual provisions that apply to the pilots of American Eagle Airlines.

113.    ALPA never advised Arbitrator Nicolau that changing the flow-through mechanism from one-out-of-every-two new hires to one based solely on seniority was dismissed by a previous arbitrator as not in compliance with Letter 3.

114.    As a result of this disguised negotiation, ALPA allowed management to further delay his transfer to American Airlines by changing the methodology governing flow-through from one-out-of-two, which would have placed the

Plaintiff at American Airlines in mid-2010 to being able to transfer to American Airlines only after every other furloughed TWA "new-hire" pilot was first given the opportunity to be recalled to American Airlines.

115.    ALPA agreed to delay the Plaintiff's transfer to American Airlines until October 9, 2013, exactly three and one-half (3.5) years after Arbitrator Nicolau's Award.

116.    In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by bad faith.

117.    In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by arbitrariness.

118.    In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by discrimination.

## Count III:
### Breach of the Duty of Fair Representation
### Damages Sought: Lost Career Earnings of $ 3,000,000.00

119.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "97" hereof, with like force and effect as though set forth at length herein.

120.    The Plaintiff met all requirements required to retain and exercise his American Airlines seniority number on October 9, 2013, under Arbitrator Bloch's ruling on June 30, 2008.

121.    All Letter 3 flow-through pilots were resigned from American Eagle Airlines by American Eagle management PRIOR to their transfer to American Airlines, so resignation from American Eagle is not a bar to flow-through rights.

122.     American Eagle Airlines, Inc. is a separate and distinct company from American Airlines, Inc.

123.     "Flow-through" pilots moving from American Eagle Airlines, Inc. to American Airlines, Inc., are not considered inter-company transfers.

124.     As a result of Arbitrator Nicolau's ruling, ALPA entered into an agreement with American Eagle management over preferential hiring rights for American Eagle pilots, pilots for whom no such rights existed at the time Arbitrator Nicolau defined the "narrow question" of the matter before him.

125.     ALPA negotiated portability rights into that agreement so that the flow-through rights for the newly benefitted pilots did not require employment at American Eagle Airlines, Inc.

126.     Former TWA, LLC pilots who were given American Airlines seniority numbers and then sent into Captain positions at American Eagle Airlines, consistent with APA and American Airlines/American Eagle Airlines' reading of Letter 3, and who subsequently resigned did not lose their American Airlines seniority numbers and were allowed to exercise the employment rights of those American Airlines seniority numbers during the proximate time that the Plaintiff was denied the right to excercise his American Airlines seniority number. In fact, even TWA, LLC pilots who were **fired** from American Eagle Airlines due to their **failing** the American Eagle pilot training program were ALLOWED to exercise the rights of their American Airlines seniority numbers, and many of them are flying at American Airlines today.

127.     ALPA committed to the Plaintiff that it would file and process a grievance on the Plaintiff's behalf, but then reneged when it came time for the arbitration phase.

128.     ALPA never challenged the removal of Plaintiff's American Airlines seniority number by American Airlines and/or American Eagle Airlines managements.

129.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by bad faith.

130.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by arbitrariness.

131.     In acting as it did, ALPA breached its duty of fair representation to the Plaintiff by acting in a manner that was characterized by discrimination.


# **PRAYER FOR RELIEF**


132.     For the reasons above, Plaintiff respectfully prays that this Court:

    i.  Assume jurisdiction of this case;

    ii.  Award actual damages to be determined at trial, but no less than $3,000,000.00;

    iii.  Award plaintiff costs and reasonable attorneys fees;

    iv.  Award such other relief, as the court deems appropriate.

## JURY DEMAND:

133.     Plaintiff respectfully demands a trial by jury on all claims and issues triable to a jury.

Dated this 31st day of March, 2014

                                        Respectfully submitted,

                                        _____
                                        Cevin D. Kehm
                                        9780 Palmetto Club Dr.
                                        Miami, FL  33157
                                        Tel: (305) 505-4443

                                        Plaintiff *Pro Se*

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by

_____ on _____

on all counsel or parties of record on the Service List below.

_____
Signature of Filer

## SERVICE LIST

Cevin D. Kehm
9780 Palmetto Club Dr.
Miami, FL  33157
Tel: (305) 505-4443
E-Mail: cevinkehm@gmail.com

Plaintiff *Pro Se*

_____
Defendant

_____
Attorney E–mail Address

_____
Firm Name

_____
Street Address

_____
City, State, Zip Code

Telephone: _____

Facsimile: _____

_____
Attorneys for Defendant