IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **CEVIN D. KEHM,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-444-O** |
| | § | |
| **AIR LINE PILOTS ASSOCIATION** | § | |
| **INTERNATIONAL,** | § | |
| | § | |
| **Defendant.** | § | |

### FINDINGS, CONCLUSION, AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO DISMISS

Pending before the Court is Defendant Air Line Pilots Association, International's Motion to Dismiss [doc. 57], filed October 17, 2014. Having carefully considered the motion, response, and reply, the Court recommends that the motion should be **GRANTED**.

### I. RELEVANT FACTUAL BACKGROUND

*Pro-se* Plaintiff Cevin D. Kehm ("Kehm") was an American Eagle pilot from January 31, 1991 until March 18, 2013, when he allegedly resigned "under duress." (Plaintiff's First Amended Complaint ("Pl.'s Am. Compl.") at 4.) Defendant Air Line Pilots Association International ("ALPA"), a labor organization, is "the largest airline pilot union in the world and represents some 53,000 pilots at dozens of airlines in the United States and Canada." (Pl.'s Am. Compl. at 4.) "In the [f]all of 1997, the pilots of American Eagle Airlines, as represented by ALPA, ratified a sixteen (16) year duration Collective Bargaining Agreement (hereinafter 'CBA') that contained a provision that moved certain American Eagle pilots to American Airlines under a defined protocol[,]" which was defined as a "Letter 3 Supplemental Agreement" ("Letter 3 Agreement") (Pl.'s Am. Compl. at 5.) Pursuant to the Letter 3 Agreement to the

1

CBA, "after a defined 'training freeze' or 'lock-in' period, certain qualifying pilots would be moved to employment at American Airlines in a ratio of one (1) qualifying American Eagle pilot for every one (1) non-American Eagle new-hire pilot that American Airlines hired (hereinafter 'one out of two' or '1:2')." (Pl.'s Am. Compl. at 5.) "Such American Eagle pilot (hereinafter 'flow-through pilot') would be placed into [training] class at American Airlines and given an American Airlines seniority ahead of (more senior to) the non-American Eagle new hire pilot that triggered such flow-through pilot's transfer to American Airlines." (Pl.'s Am. Compl. at 5.)[1]

As a result of the events of September 11, 2001, American Airlines furloughed thousands of pilots. The furloughed pilots included former pilots from TWA, whom American Airlines had acquired in January of 2001, as well as current American Airlines pilots. (Pl.'s Am. Compl. at 5.) In 2001, as a result of this furlough, the ALPA attempted to change the flow-through protocol through the dispute resolution process. (Pl.'s Am. Compl. at 6.) "The arbitrator in the above dispute ruled against ALPA and stated that American Eagle pilots were not considered 'furloughed' American Airlines pilots and that Letter 3 provided no transfer mechanism other than one flow-through pilot per one American Airlines non-flow through new hire pilot." (Pl.'s Am. Compl. at 6.)

Next, ALPA filed a grievance claiming that the TWA pilots were new hire pilots and should, as a result, trigger Letter 3 Agreement flow-through provisions. (*Id.*) "On May 11, 2007, Arbitrator John LaRocco [("Arbitrator LaRocco")] ruled that former TWA pilots who did not commence active employment at American Airlines in conjunction with the merger (who in fact were furloughed by American Airlines directly from TWA, LLC, and who had never commenced new-hire training at American Airlines) were equivalent to new hires within the

---

[1] In his response to Defendant's Motion to Dismiss, Kehm claims that he "qualified for a position as a pilot with American Airlines by virtue of his compliance with the requirements set forth in [the Letter 3 Agreement]. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss First Amended Complaint at 4.)

2

meaning of Letter 3, and that the presence of former TWA pilots on the American Airlines seniority list cannot interfere with the rational operation of Letter 3." (*Id.*) According to Defendant, Arbitrator LaRocco remanded the issue of remedy to the parties. (Defendant's Substituted Memorandum of Law in Support of Motion to Dismiss ("Def.'s Memo.") at 4.)

After Arbitrator LaRocco's ruling, American Eagle management filed a grievance regarding the effect the expiration of the Letter 3 agreement on May 1, 2008 would have on American Eagle pilots' employment opportunities at American Airlines under such agreement. (Pl.'s Am. Compl. at 7.) Arbitrator Richard Bloch ("Arbitrator Bloch") ruled on June 30, 2008 that "the right to flow-through to American Airlines is to be retained by American Eagle pilots governed by Letter 3 who, prior to May 1, 2008[,] received American Airlines seniority numbers." (*Id.*) Thereafter, on October 20, 2008, after the parties disagreed on the issue of remedy, Arbitrator LaRocco "awarded American Airlines seniority numbers to a group of American Eagle pilots that included the Plaintiff in this matter." (Pl.'s Am. Compl. at 7; *see* Def.'s Memo. at 4.) "Subsequent to Arbitrator LaRocco's ruling and award, and subsequent to Arbitrator Bloch's determination, each in favor of supporting the contractual rights of Letter 3 pilots, ALPA never moved to enforce such rights and never demanded that management begin immediately complying with the arbitration awards described above." (Pl.'s Am. Compl. at 7.) "Had ALPA done so, the Plaintiff would have commenced employment at American Airlines during 2010." (*Id.*)

On June 1, 2009, almost seven months after Arbitrator LaRocco's award of American Airlines seniority numbers to Kehm and other American Eagle pilots, ALPA filed a grievance before Arbitrator George Nicolau ("Arbitrator Nicolau") to determine whether American Eagle pilots that held American Airlines seniority numbers were entitled to attend American Airlines

training classes beginning in June 2007, "when AA began to recall former TWA 'new hire' pilots." (Def.'s Memo. at 4; *see* Pl.'s Am. Compl. at 8.) "On October 18, 2009, Arbitrator Nicolau ruled that American Eagle pilots who held American Airlines seniority numbers were entitled to attend American Airlines training classes beginning in June 2007." (Pl.'s Am. Compl. at 8.)

Thereafter, Plaintiff alleges that ALPA "embarked upon a lengthy and clandestine negotiation with management that centered on creating new employment rights at American Airlines for non-Letter 3 pilots." (Pl.'s Am. Compl. at 8.) After a remedy on the question ruled upon by Arbitrator Nicolau could not be agreed upon, the question was returned to Arbitrator Nicolau. (*Id.*) After a series of hearings and private meetings that Kehm claims involved secretive deals to waive provisions applicable to Letter 3 pilots, Kehm alleges that the "mediated negotiation that was masqueraded by ALPA as a Remedy Hearing . . . traded existing rights of flow-through pilots—rights that had been affirmed by at least 3 separate arbitrations—for entirely new rights for pilots . . ., who held a high union office and participated in the events" leading up to this remedy decision. (Pl.'s Am. Compl. at 13.) Nicolau's remedy award was dated April 9, 2010. (Pl.'s Am. Compl. at 14.)

Kehm argues that as "a result of this mediated negotiation, [he] not only lost the ability to transfer to American Airlines upheld by Arbitrators LaRocco, Bloch and Nicolau, but had his transfer mechanism detrimentally—and fatally—changed from that mandated by Letter 3 (i.e. one-out-of-every-two new hires) to a seniority-based system rejected by a previous arbitration and which guaranteed that the Plaintiff would only be allowed to transfer to American Airlines after every other furloughed pilot on the American Airlines seniority systems was offered recall, and only if, after that point, American Airlines wished to bring on any additional pilots." (Pl.'s

Am. Compl. at 13.) Kehm further claims that no American Eagle Letter 3 pilots transferred to American Airlines between June 2007 and April 2010. (Pl.'s Am. Compl. at 14.)

Thereafter, on September 14, 2011, ALPA, American Eagle, American Airlines, and the Allied Pilots Association ("APA"), entered into an agreement, known as the Letter 12-05, to satisfy Arbitrator Nicolau's directive in the April 9, 2010 award that American Airlines would offer to 824 additional American Eagle captains one of every two positions in a new-hire class in order of American Eagle seniority. (Def.'s Memo. at 8; *see* Defendant's Appendix to Motion to Dismiss ("Def.'s App.") at 47-50. Letter 12-05 included language that stated, "Any American Eagle pilot who voluntarily resigns or who is discharged from American Eagle will have no rights under this letter unless reinstated by an arbitrator." (Def.'s App. at 49.)

"On March 18, 2013, [Kehm] resigned under duress from American Eagle Airlines in order to access 401(k) savings that were needed while recovering from an illness." (Pl.'s Am. Compl. at 14.) Kehm claims that at "no time did [he] ever resign his American Airlines seniority number and at no time did ALPA or American Eagle Airlines ever advise [him] that his resignation would—in their estimation—cause [him] to lose his American Airlines seniority number. (Pl.'s Am. Compl. at 14.) Kehm alleges, upon information and believe, that "it was ALPA who demanded that [Kehm] be removed from the American Airlines seniority list in retaliation for [his] lack of support and criticism of the then current ALPA administration on the American Eagle property." (Pl.'s Am. Compl. at 14.) Kehm claims that he had expressed criticism of ALPA based on his many years of union service, "which culminated in his election as MEC Chairman in 2000, the highest elected position on any ALPA property." (*Id.*) Kehm alleges that throughout the arbitration process, beginning prior to the LaRocco arbitration in 2008 and concluding in 2014, Kehm "was in constant communication with ALPA lawyers in

Texas and Washington, DC., warning about the harm accruing by ALPA's local actions in the matter of Letter 3 and its non-enforcement and manipulation by ALPA elected officials on the American Eagle property." (Pl.'s Am. Compl. at 14.)

Kehm claims that "[o]n or about May, 2013," his Letter 3 Agreement peers began receiving notification from American Airlines that they were being summoned to class at American Airlines. (Pl.'s Am. Compl. at 14.)  When he did not receive any such notification, Kehm contacted ALPA lawyer Wayne Klocke on May 21, 2013.  (Pl.'s Am. Compl. at 15.) Initially, ALPA agreed to process Kehm's grievance but indicated it would not support Kehm's position. (Pl.'s Am. Compl. at 15.)  Thereafter, Klocke changed his mind and stated that ALPA might support Kehm's grievance if he provided evidence that he had been forced to resign. (Pl.'s Am. Compl. at 15.)  Kehm claims that he supplied ALPA with the "text of his grievance" on October 2, 2013. (Pl.'s Am. Compl. at 16.)  Kehm alleges that ALPA tried to get him to change the grievance and after Plaintiff refused, ALPA ultimately, after dragging out the process, "reneged on its commitment to process and file a grievance on behalf of [Kehm] using the excuse that the other parties would not agree to participate in a mandatory dispute resolution process." (Pl.'s Am. Compl. at 16.)  On January 9, 2014, ALPA advised Kehm that it would take no further action in his grievance. (*Id.*)  Kehm further alleges:

> On August 13, 2014, Plaintiff received a copy of an e-mail (Attachment 1 hereto) that describes a conversation between a former American Eagle flow-through pilot and APA board of Directors member Captain Sam Mayer (who, upon information and belief, held leadership positions within the APA during relevant periods described in this Complaint and does so today) wherein Captain Mayer states that ALPA refused (during some period of negotiations between the LaRocco ruling and October 9, 2014[2]) management and APA offers of compensatory measures to Letter 3 pilots.  ALPA cannot dispute that American Eagle flow-through (Letter 3) pilots were delayed in their transfer to AA; ALPA agreed to this.  However, compensation to Letter 3 pilots was not of interest to ALPA leaders Dave Ryter and Brian Sweep.  What they wanted, negotiated for

---

[2] This appears to be a typographical error and the Court assumes Kehm meant to reference October 9, 2013.

and ultimately acquired was employment rights for themselves at AA. These rights were paid for by converting compensatory damages to pilots actually harmed by ALPA (flow-through Letter 3 pilots) into jobs for pilots who had no rights under Letter 3 of the CBA. Not only is this a breach of ALPA's Duty of Fair Representation, it is also evidence that the harm visited on the Plaintiff was the result, not of discreet arbitrator decisions that stood on their own, but of a continuing violation that ultimately ripened on October 9, 2014,[3] when the Plaintiff was denied the right to exercise his AA seniority number by attending new-hire class at AA.

(Pl.'s Am. Compl. at 17.)

Kehm filed this suit against ALPA on March 31, 2014. Thereafter, on September 29, 2014, Kehm filed an Amended Complaint in which he alleged the following causes of action against Defendant: (1) breach of the duty of fair representation based on claims that ALPA engaged in improper activities to delay and avoid the enforcement of the May 11, 2007 ruling and supplemental award by Arbitrator LaRocco (Pl.'s Am. Compl. at 18); (2) breach of the duty of fair representation based on claims of the effects from ALPA shopping "Arbitrator LaRocco's ruling to Arbitrator Nicolau in an attempt to delay enforcement of Arbitrator LaRocco's award and allow for more time to negotiate new rights at American Airlines for pilots who had no stake or benefit in Letter 3" (Pl.'s Am. Compl. at 19-20); and (3) breach of duty of fair representation in: (a) ALPA's agreement, after Arbitrator Nicolau's ruling, with American Eagle management over preferential hiring rights for certain pilots and (b) failing to challenge the removal of Kehm's American Airlines seniority number by American Airlines management on October 9, 2013 even though he had met all requirements to retain and exercise such rights under Arbitrator Bloch's June 30, 2008 ruling. (Pl.'s Am. Compl. at 20-21).

In its motion to dismiss, Defendant argues that Kehm's first two causes of action should be dismissed because they are barred by the six-month statute-of-limitations period for breach of

---

[3] Again, this appears to be a typographical error and the Court assumes Kehm meant to reference October 9, 2013.

duty of fair representation claims. (Def.'s Memo. at 1.)  As to the third cause of action,

Defendant asserts that part of such count is also barred by the statute of limitations and the

remainder should be dismissed as Kehm "has pled no facts plausibly showing a [duty of fair

representation] breach." (Def.'s Memo. at 1.)  In sum, Defendant claims that ALPA did not owe

Kehm a duty of fair representation after he resigned from American Eagle and Kehm's grievance

"contradicted the terms of Letter 3 and exceeded the scope of an arbitrable grievance." (Def.'s

Memo. at 1.)

## II.    LEGAL STANDARDS

Rule 12 (b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon

which relief can be granted." This rule must be interpreted in conjunction with Federal Rule of

Civil Procedure 8(a), which sets forth the requirements for pleading a claim for relief in federal

court.  Rule 8(a) calls for "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506,

513 (2002) (holding that Rule 8(a)'s simplified pleading standard applies to most civil actions).

The Court must accept as true all well-pleaded, non-conclusory allegations in the complaint and

liberally construe the complaint in favor of the plaintiff. *Kaiser Aluminum & Chem. Sales, Inc.

v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982).

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to

avoid dismissal. *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992). Indeed, the

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.

Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a

right to relief above the speculative level, . . . on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). The Court need not

credit bare conclusory allegations or "a formulaic recitation of the elements of a cause of action." *Id.* Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

"Generally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments. A court is permitted, however, to rely on documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). "A written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding." *Ferrer v. Chevron Corp.,* 484 F.3d 776, 780 (5th Cir. 2007). In addition, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.,* 343 F.3d 533, 536 (5th Cir. 2003)).

"Relations between employees and their labor unions in the airline industry are governed by the [Railway Labor Act ("RLA")]". *Gerhardt v. Air Transp. Local 557*, No. H-09-3314, 2011 WL 666500, at *2 (S.D. Tex. Feb. 14, 2011); *see* 45 U.S.C. § 181. "Under the RLA, because a union serves as the employees' exclusive bargaining representative, it maintains a statutory duty to fairly represent all those covered employees both in its collective bargaining with an employer and in its enforcement of a resulting collective bargaining agreement." *Simmons v. Local 565 Air Transp. Div. Transp. Workers Union of Am.*, No. 3:09-CV-1181-B, 2010 WL 4314074, at *3 (N.D. Tex. Oct. 25, 2010) (citing *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). A cause of action alleging a breach of the duty of fair representation derives its authority from the National Labor

Relations Act ("NLRA").  *See* 29 U.S.C. § 159(a); *Simmons*, 2010 WL 4314074, at *3.  The

NLRA has been interpreted to impose a "duty of fair representation" ("DFR") on labor unions,

which a union breaches when its conduct toward members of its bargaining unit is arbitrary,

discriminatory, or in bad faith.  *See Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*,

494 U.S. 558, 563 (1990).  This duty extends to challenges leveled not only at a union's contract

administration and enforcement efforts, but at its negotiation activities as well.  *Commc'ns

Workers v. Beck,* 487 U.S. 735, 739 (1988).

      The bar to a claim by the statute of limitations is an affirmative defense.  *White v.

Padgett*, 475 F.2d 79, 82 (5th Cir. 1973).  It is most properly raised in an answer, Fed. R. Civ. P.

8(c); however, the defense can also be raised by a motion to dismiss where the complaint

affirmatively shows that the claim is barred.  *J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d

77, 78 (5th Cir. 1962).  For claims of breach of the duty of fair representation against a union, a

cause of action borrowed from the identical duty under the National Labor Relations Act, the

statute of limitations is six months.  *Simmons*, 2010 WL 4314074 at *3 (citing *Richardson v.

United Steelworkers of America*, 864 F.2d 1162, 1167 (5th Cir. 1989) and *Brock v. Republic

Airlines, Inc.,* 776 F.2d 523, 525–26 (5th Cir. 1985)).  *See also DelCostello v. Int'l Bhd. of

Teamsters,* 462 U.S. 151, 163–65 (1983); *Smith v. Int'l Org. of Masters, Mates & Pilots,* 296

F.3d 380, 382–83 (5th Cir. 2002) (six-month limitations period applies to fair representation

claims brought only against the union).  A cause of action under a duty of fair representation

claim accrues when the union member knew or reasonably should have known that the breach

occurred.  *See Simmons*, 2010 WL 4314074 at *3 (citing *Barrett v. Ebasco Constructors, Inc.,

868 F.2d 170, 171 (5th Cir.1989)).  *See also Trial v. Atchison, Topeka & Santa Fe Ry.*, 896 F.2d

120, 124 (5th Cir. 1990) (stating that the period "begins to run when the claimants discover or in

the exercise of reasonable diligence should discover, the acts that form the basis of their [DFR] claim"). In *Lee v. Cytec Industries, Inc.,* 460 F.3d 673, 676 (5th Cir. 2006), the court, addressing the concept of equitable tolling in the DFR context, stated:

> Equitable tolling is an exception to the general rule that an employee has six months to sue from the discovery of the breach of the duty of fair representation. The rationale for it is that because some plaintiffs must exhaust internal contractual remedies (*e.g.*[,] the grievance process) before suing, it would be unfair to say that the plaintiffs' claim is barred by limitations if, while the grievance is pending, the six-month federal statute of limitations expires.

The *Lee* court nevertheless held that a claimant "had to sue within six months of the time it became obvious that the union had rejected his claim." *Id.* at 677.  *See also Linzay v. Nat'l Postal Mail Handlers Union Local 312,* No. 06–0061–A, 2007 WL 4321930, at \*2 (W.D. La. Dec. 5, 2007).

## III.   DISCUSSION

### A.  Counts I and II

Plaintiff's first two counts address the alleged failure to enforce the ruling of the first arbitrator, Arbitrator LaRocco, and the subsequent "shopping" for new arbitrators. (*See* Pl.'s Am. Compl. ¶¶ 83-101.)  These counts, while listed separately, are artificially distinct and assert virtually identical claims.  The assertion is, in essence, that ALPA refused to enforce Arbitrator LaRocco's May 11, 2007 ruling and supplemental award and that "ALPA 'shopped' Arbitrator LaRocco's ruling to Arbitrator Nicolau in an attempt to delay enforcement of Arbitrator LaRocco's award and allow for more time to negotiate new rights to jobs at American Airline for pilots who had no stake or benefit in Letter 3." (Pl.'s Am. Compl. ¶ 92.)  As set forth below, the events triggering both claims were known by Kehm well over six months prior to the date Kehm filed his original complaint on March 31, 2014.

11

To begin with, Defendant is correct in pointing out that Plaintiff's First Amended Complaint is self-defeating in regards to Count I and II.  (Def.'s Reply at 1.)  As to Count I, Kehm openly professes that "[he] would have commenced employment at [AA] during 2010" if ALPA had enforced Arbitrator LaRocco's ruling and award and Arbitrator Bloch's determination.  (*See* Pl.'s Am. Compl. ¶ 32.)  This statement demonstrates any alleged breach of DFR and harm occurred at the latest in 2010, if not earlier.  (Pl.'s Am. Compl. ¶ 31-32.)

In addition, while Kehm makes allegations that the Nicolau arbitration had been unnecessarily and unethically dragged out without proper communication, that Kehm had been denied his request of documents relating to the LaRocco and Nicolau rulings, and that he was not actually harmed until October 9, 2013 (Pl.'s Resp. at 14-15), such allegations do not negate the fact that the alleged breach of failure to enforce the arbitrators' rulings had already occurred.  In addition, Kehm's resignation letter dated March 18, 2013, a full year before he filed suit, indicates he had been aware of the multiple alleged issues he had with ALPA and its alleged failure to properly represent the union members.  (Def.'s Memo. at 7; Defendant's Appendix in Support of Motion to Dismiss ("Def.'s App.") at 203.    Thus, Plaintiff's claims in Counts I and II are barred because Kehm filed the present case well over six months after he became aware of such alleged breaches of DFR.

Finally, Kehm's assertions in his First Amended Complaint provide further evidence of his awareness of the alleged breach of DFR, well over six months prior to Kehm filing suit: "Throughout the arbitration processes, beginning prior to the LaRocco arbitration in 2008, and concluding only months ago in 2014, the Plaintiff was in constant communication with ALPA lawyers in Texas and Washington, D.C., warning about the harm accruing by ALPA's local actions in the matter of Letter 3 and its non-enforcement and manipulation by ALPA elected

officials on the American Eagle property." ("Pl.'s Am. Compl. ¶ 68.)  The record is replete with similar information evidencing that Plaintiff was not only aware, but constantly concerned with, the alleged breach of DFR resulting from the actions of ALPA of which he now complains.  *See*, *e.g.*, *Landry*, 901 F.2d 404, 412-13 (5th Cir. 1990).  Thus, the statute of limitations has lapsed and dismissal of the first two counts in Plaintiff's complaint is appropriate.

## B.  Count III

Kehm appears to assert the following two bases in Count III for ALPA's alleged breach of duty of fair representation: (a) ALPA's agreement, after Arbitrator Nicolau's ruling, with American Eagle management over preferential hiring rights for certain pilots, and (b) failing to challenge the removal of Kehm's American Airlines seniority number by American Airlines management on October 9, 2013 even though he had met all requirements to retain and exercise such rights under Arbitrator Bloch's June 30, 2008 ruling.

As to the first claim in Count III, such claim refers to allegations arising out of Letter 12-05, which was signed on September 14, 2011.  Consequently, just as with Counts I and II above, this claim is time-barred as such alleged breach of DFR occurred several years prior to Kehm filing suit on March 31, 2014, and Kehm was, or should have been, aware of such alleged breach years ago.

As to the second claim in Count III, it is well-established law that a union owes a duty only to its members. *Humphrey v. Moore*, 375 U.S. 335, 342 (1964) (stating that the DFR extends to "all ***members*** of an appropriate unit") (emphasis added).  Under the RLA, collective bargaining extends to "person[s] in the service of a carrier . . . who perform[] any work defined as that of an employee or subordinate official[.]"  45 U.S.C. § 151.  Once a member leaves the group, the duty generally no longer applies. *See, e.g., Allied Chemical and Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181-82 & n. 20 (1971)

13

(stating that retirees were "not members of the bargaining unit" and the union, therefore, was "under no statutory duty to represent them in negotiations with the employer"); *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1270, 1272-73 & n.11 (5th Cir. 1990) (stating that when "an individual terminates his relationship with both employer and union, the union ceases to be his exclusive representative in disputes with the former employer").

In this case, the CBA between American Eagle and ALPA, which was referenced by Kehm in his First Amended Complaint, states:

> F. LOSS OF SENIORITY
>
>> A pilot will forfeit all seniority rights and his name will be removed from the Seniority List when:
>>
>> 1.      He retires or resigns; . . .

(Def.'s App. at 13.)   In addition under the Letter 3 Agreement, to be eligible to transfer to American Airlines, a pilot had to be (1) a line pilot (2) employed by American Eagle, (3) with an American Eagle seniority number.  (Def.'s Memo. at 2, 22-24; Def.'s Reply at 5; *see* Def.'s App. at 16.)

Based upon the above provisions, any duty ALPA owed to Kehm terminated when he voluntarily resigned on March 18, 2013.  As a result, the union no longer owed him a duty of fair representation for any events occurring after March 18, 2013.  Consequently, Kehm's second claim in Count III that ALPA failed to challenge the removal of Kehm's American Airlines seniority number by American Airlines management on October 9, 2013, several months after he had resigned, is not enforceable as a matter of law.

### C. Alleged Continuing Violation

As to Counts I, II and the first part of Count III, Kehm argues that the statute of limitations does not bar his claims because ALPA's conduct constituted a "continuing violation."

14

(Pl.'s Am. Compl. ¶ 82.)   In support, Kehm argues, in essence, that the continuing violation ultimately ripened on October 9, 2013,[4] "when [Kehm] was denied the right to exercise his AA seniority number by attending new-hire class at AA." (Pl.'s Am. Compl. at 17.)

The "continuing violation doctrine is equitable in nature and extends the limitations period on otherwise time barred claims only when the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004). "Although there is no definitive standard for what constitutes a continuing violation, a plaintiff seeking to invoke this doctrine must demonstrate more than a series of discrete discriminatory acts" and "must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Huckabay v. Moore,* 142 F.3d 233, 239 (5th Cir.1998).   In evaluating a claim of "continuing violation" where discrimination is alleged, the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (emphasis in original).   One-time discrete employment events that have lingering effects are not continuing violations.   *See United Transp. Union v. Florida E. Coast Ry. Co.*, 586 F.2d 520, 527 (5th Cir. 1978) (stating that union's claim that carrier violated RLA by abrogating collective bargaining agreement was not a continuing violation even though effects of alleged violation continued after claim arose).

In this case, Kehm cannot plausibly allege a continuing violation based on the effects of the 2008 LaRocco arbitration, when Kehm complained to ALPA about its actions beginning as early as 2008, demonstrating knowledge of his cause of action since then.   (*See* Pl.'s Am. Compl.

---

[4] Kehm actually refers to October 9, 2014.   (Pl.'s Am. Compl. at 17.)   However, as set forth above, the Court concludes that Kehm meant to refer to October 9, 2013.

¶ 68.)  Moreover, Kehm's failure to transfer to American Airlines in October 2013 is not a separately-actionable wrong.  Instead, it was a continuation of the effect of ALPA's alleged earlier misconduct of agreeing to permit the delayed transfer of American Eagle pilots to American Airlines.  *See Cantrell v. Int'l Bhd. of Elec. Workers, Local 2012*, 32 F.3d 465, 468 (10th Cir. 1994) (finding that failure to show harassment by union within limitations period defeats "continuing violation" claim based on earlier harassment); *Int'l Ass'n of Machinists and Aerospace Workers v. Aloha Airlines, Inc.*, 790 F.2d 727, 737 (9th Cir. 1986) ("The fact that a party violating the RLA persists in its position or that the effects of its actions continue after the claim initially arose does not create a continuing violation so that the statute of limitations is re-started with each action.").

## IV.   CONCLUSION

In conclusion, ALPA's alleged actions (or lack thereof) beginning as early as 2008 had a sufficient degree of permanence to put Kehm on notice to enforce his rights.  Kehm's allegations in his First Amended Complaint show that he had actual notice of the discrete action by ALPA, the refusal to enforce the initial arbitration ruling.  Moreover, ALPA's alleged subsequent 'shopping' for additional arbitrator rulings should have likewise "trigger[ed] [the] [Plaintiff's] awareness of and duty to assert his or her rights." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001) (citing *Huckabay* at 239).  The pleadings establish that Plaintiff had notice of ALPA's actions, not months, but *years* before filing his complaint on March 31, 2014.  Moreover, there is insufficient evidence of a continuous violation of discrimination on the part of ALPA and Kehm's case should be dismissed.

**RECOMMENDATION**

Based on the foregoing, it is **RECOMMENDED** that Defendant's Motion to Dismiss for Failure to State a Claim [doc. 57] be **GRANTED**.

**NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT**

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**ORDER**

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **May 1, 2015** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED April 17, 2015.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE